UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARK LIONETTI, | : | CIVIL ACTION |
| | : | NO. |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID LIONETTI, SHORELINE | : | NOVEMBER 25, 2024 |
| POOLS, INC., AND RICHARD UVA | : | |
| (NOMINALLY, AS THE TRUSTEE OF | : | |
| THE LUCIO LIONETTI CREDIT | : | |
| FORMULA TRUST), | : | |
| | : | |
| Defendants. | : | |

## **COMPLAINT**

## **NATURE OF THE CASE**

1.     This action arises out of a pattern of oppressive conduct by Defendant David Lionetti ("David"), the majority shareholder and President of Shoreline Pools, Inc. ("Shoreline" or the "Company"), designed to humiliate and, ultimately, to oust Plaintiff, Mark Lionetti ("Plaintiff" or "Mark"), who is David's older brother, from his rightful role in the company their family built together.  The systematic and deliberate acts of shareholder oppression, self-dealing, financial manipulation, breach of fiduciary duty, and the improper use of corporate resources and control of Shoreline has resulted in significant harm to Mark.  As set forth below, David has abused his position by misappropriating or misusing corporate assets, taking control of Shoreline through a clandestine plan to purchase a majority of Shoreline stock, denying Mark access to Shoreline financial records, and unjustly stripping Mark of management and shareholder rights, all while using Shoreline for personal enrichment. Plaintiff seeks monetary damages, injunctive relief, and dissolution of Shoreline.

**PARTIES**

2.      The plaintiff, Mark Lionetti, is a natural person and citizen of the State of Florida, with a place of residence at 11210 Orange Hibiscus Lane, Palm Beach Gardens, Florida. Mark is a minority shareholder in Shoreline Pools, Inc., and currently holds at least 29.7% of Shoreline shares of stock.

3.      The defendant, David Lionetti, is a natural person and a citizen of the State of Connecticut, with a place of residence at 88 Blueberry Drive, Stamford, Connecticut. David is Mark's younger brother, and David claims he is currently the majority shareholder of Shoreline Pools, claiming he owns 59.4% of the shares of Shoreline.

4.      At all relevant times mentioned herein, Defendant Shoreline was and still is a domestic corporation organized and operating under the laws of the State of Connecticut, with its principal place of business located at 393 West Avenue in Stamford, Connecticut. Shoreline operates in the pool design, construction, and service industry.

5.      At all relevant times mentioned herein, Richard Uva ("Uva") has been the trustee of the Lucio Lionetti Credit Formula Trust, which was created and funded after the death of Mark's and David's father, Lucio Lionetti, for the benefit of their mother, Valentina Uva Lionetti ("Valentina").  Uva is a Connecticut resident and the Credit Formula Trust, which holds 11.15% of Shoreline's shares, is a trust formed under Connecticut law.  Uva is named herein in his capacity as trustee as a nominal defendant for purposes of Plaintiff's requested dissolution of Shoreline.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of

citizenship between the parties. Plaintiff is a citizen of Florida. Defendant, David Lionetti, is a citizen of Connecticut. Defendant Shoreline is a corporation organized under the laws of Connecticut with its principal place of business in Stamford, Connecticut. Defendant Uva, in his capacity as trustee of the Lucio Lionetti Credit Formula Trust, is a Connecticut resident acting as trustee of a trust formed under Connecticut law.

7.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because the defendants reside in this judicial district, and a substantial part of the events giving rise to the claims occurred here.

## FACTS COMMON TO ALL CLAIMS

### History of Shoreline Pools, Inc.

8.    Over the course of more than 30 years, Mark and David worked together to grow Shoreline, the family business founded by their father, into one of the pre-eminent swimming pool construction and maintenance companies in the country – and a very valuable business. Unfortunately, David has now aimed his greed and propensity in general for questionable conduct towards Mark, his older brother and long-time business partner, in a calculated and intentional scheme of shareholder oppression and self-dealing to drive Mark out of the business and deprive him of the value of his ownership interest in Shoreline.

9.    As set forth herein, David apparently thinks he is above the law and can do whatever he wants without consequences – much like the typical school-yard bully (at least until that bully is confronted).  Because Mark is a trusting person with abundant integrity, David apparently also assumed Mark would let him get away with his misconduct and take over control of Shoreline.  Mark can no longer remain passive while David aggressively – and wrongfully -- mismanages and dominates Shoreline for his own personal benefit. It's time to confront the bully.

10.    In his relentless pursuit to remove every family member from the business their father started over fifty years ago with the intention of having it remain and run as a _family business_ including ALL of his children, David has resorted to cunning manipulation to secure his own rise to power. Through deceitful tactics, he has weakened the financial standing of his siblings, grandchildren, and shareholders alike, all while orchestrating malicious distractions to divert attention from his true intentions. For years, this has been his established modus operandi—scheming to force the hands of those around him, ensuring his dominance at any cost.

11.    David has left Mark with no choice but to bring this proceeding for dissolution of Shoreline based on David's deliberate and calculated oppression of Mark as a Shoreline shareholder – in some instances, with apparent collaboration from Shoreline's attorneys and accountants.  David's covert and not-so-covert efforts to wrest control of Shoreline and its substantial income and assets from Mark, who David claims is now a minority shareholder, mandate dissolution as a matter of law.

12.    This Complaint details David's clear pattern of exploiting his family members and mismanaging Shoreline for personal gain.  From undermining Mark's role in the business to defrauding other family members, including their brother, Brian[1], and even their elderly mother, David's actions reveal a very deliberate – and wrongful -- scheme to consolidate power and use the family business as his personal piggy bank.

13.    Shoreline was founded in 1969 by Lucio Lionetti ("Lucio"), the father of Mark, David and Brian, as a pool installation and service company. Since its formation, Shoreline was,

---

[1] Brian Lionetti ("Brian") is the third Lionetti brother who is currently largely unassociated with the Shoreline business aside from his ownership of shares of Shoreline that David claims to have purchased, as discussed herein.

and continues to be, in the pool design, construction, and service industry.  Lucio operated the business alongside his sons, Mark, Brian, and David, until his death in 1992.

14.     At the time of Lucio's death, he owned 100% of the issued and outstanding shares of stock in Shoreline. Pursuant to the terms of his Will, Lucio's shares of stock were transferred into various testamentary trusts created under his Will, for the benefit of his widow, Valentina. These trusts were managed by Valentina and her brother, Uva, as trustees pursuant to Lucio's Will.

15.     On or about March 30, 2001, Uva, acting as the trustee of three specific trusts under Lucio's Will, instructed Shoreline to transfer all shares held by these three trusts to Valentina in her individual capacity. In a letter to Shoreline, Uva included executed stock powers for the transfer of the shares along with affidavits of lost stock certificates. This operated to transfer 88.85% of the shares of Shoreline stock out of trust to Valentina personally, with 11.15% of the shares of stock remaining in a trust.[2]

16.     By a letter dated November 3, 2004, Valentina then transferred her shares of Shoreline stock equally to her three sons: Mark, David, and Brian (via the Lionetti Trust for the benefit Brian Lionetti, of which Richard Uva is also trustee), resulting in each son holding

---

[2] These shares, comprising 11.15% of the stock of Shoreline, remained in the Credit Formula Trust, under Lucio's Will, for the benefit of Valentina, with Uva and Valentina designated as trustees. Valentina passed away on April 6, 2024, and her Estate is currently being probated in the Darien/New Canaan Probate Court. *See* Docket Nos.: PD5224-00046 and PD5224-00151. Because the Credit Formula Trust remains a shareholder of Shoreline, it has been named as a nominal defendant in this action.  Upon information and belief, and as alleged in petitions filed in the Probate Court, David utilized funds from their mother's accounts to cover personal expenses and avoid financial obligations owed to her Estate from Shoreline. While entrusted with Power of Attorney over their mother's financial affairs, on information and belief, David repeatedly acted in ways contrary to her best interests. Instead of using his authority to support her needs, David misappropriated her assets for his personal benefit.

approximately 29.7% of the shares of Shoreline stock, and the Credit Formula Trust holding the remaining 11.15% shares.

**Mark's Role and Contributions to Shoreline**

17.    For well over 30 years after their father's death, Mark and David[3] managed Shoreline together, growing it into a significant enterprise in the pool construction and service industry.  Mark held the position of Vice President of Shoreline and was the President of Shoreline's service operations division[4], while David served as President of Shoreline and as President of the new pool construction division. David was primarily responsible for design and installation of pools.

18.    The service operations division, overseen by Mark, consistently served as the primary profit driver of Shoreline, while David's construction division often struggled with profitability. Mark's leadership in the service operations division ensured a steady revenue stream, even during economic downturns, while David pursued risky and less sustainable ventures.

**David's Mismanagement and Criminal Conviction**

19.    David's management of Shoreline was further marred by a four-year criminal proceeding that began in 2007, culminating in his 2011 conviction for criminally negligent

---

[3] Brian worked for Shoreline through the early 2000s in less of a leadership capacity than his brothers. Brian concluded his tenure at the family business following the closing of Shoreline's retail Spa and Hot Tub store around 2005.

[4] Mark ran the service division of Shoreline Pools for 20 years independently, prior to his father's death in 1992.

homicide following the tragic death of a six-year-old child caused by his negligent pool construction practices. In the aftermath, Mark was forced to lead efforts to restore Shoreline's reputation through the successful service division, shouldering the burden of rebuilding client trust while David continued his mismanagement.

20.     In recent years, however, David began taking steps that systematically marginalized Mark's role and influence within the company.

**David's Campaign to Marginalize Mark**

21.     By 2020, David had implemented a campaign to oust Mark from his role with Shoreline and to transfer day-to-day control of Shoreline, which Mark had done for decades, to David's son-in-law, Dan Kollar, under the guise of love and concern.  David began encouraging Mark to work remotely, framing the idea as a way to prioritize Mark's well-being and reduce his workload after decades of dedication to the Company.

22.     David's intention all along was to manufacture a narrative that Mark was being paid without working, setting the stage for Mark's eventual exclusion from Shoreline's leadership. Mark, unaware of David's scheme, continued to fulfill his responsibilities remotely, dedicating countless hours to mentoring his son Dave and providing critical support to the service and renovation division. Mark held virtual meetings with his son Dave every morning and evening, spending hours discussing jobs, pricing, and operational issues. His phone constantly rang with calls from Dave and other service and renovation personnel throughout the day, making Mark's dedication well-known—even humorously noted among his golf companions, many of whom declined to play with Mark due to his constant work-related calls.

23.     David's encouragement of Mark to work remotely was part of David's calculated strategy to slowly transfer Mark's duties to his inexperienced son-in-law, Dan Kollar, while

repeatedly assuring Mark of his job security and continued value to the company. Unbeknownst to Mark, while Mark was working remotely, David was using this as an opportunity to transfer Mark's responsibilities to Kollar, who lacked experience in the pool industry, but to whom David agreed to provide an exorbitant starting salary. Despite overpaying Kollar, David claimed financial difficulties to justify withholding shareholder distributions that year.

24.     Upon information and belief, David has actively sought to undermine Mark's authority and reputation within Shoreline by disparaging him to employees, customers, and other business contacts. David's actions, including spreading false or misleading statements about Mark's competence and dedication to the company were calculated to erode Mark's relationships with Shoreline personnel and loyal clients, further isolating Mark and consolidating David's unilateral control over the company. These efforts are consistent with David's broader scheme to marginalize Mark's role within Shoreline and to misappropriate the goodwill Mark built over decades of service.

**The Covert Acquisition of Brian's Shares**

25.     In 2022, David moved to the second phase of his efforts to take over Shoreline from Mark. David began covert efforts to purchase Brian's shares in Shoreline under the pretense of helping Brian with his financial struggles. Unbeknownst to Mark, David had systematically decreased Brian's salary to such an extent that Brian was left with no viable alternative but to sell his shares. Exploiting Brian's financial vulnerability, David assured him that Mark would be pleased with the arrangement, further masking his true intentions of consolidating control over Shoreline without Mark's knowledge or involvement. This calculated maneuver was part of David's broader scheme to marginalize both of his brothers while advancing his personal interests.

26.    Initially, David falsely promised Mark he would facilitate a joint purchase of Brian's shares by David *and Mark* in equal shares.  Instead, upon information and belief, David secretly (i.e., without telling Mark and without Shoreline's attorneys advising Mark) coordinated with Shoreline's attorneys to covertly buy Brian's shares entirely for himself at a grossly undervalued price, consolidating his majority control of Shoreline and deceiving both Mark and Brian in the process.

27.    More particularly, based on documents Mark has received, David initially attempted to structure a transaction with Brian whereby David and Shoreline would each purchase Brian's Shoreline shares.  David planned to purchase 145 of Brian's Shoreline shares with an upfront payment of $1,000,000.00, financing the remaining purchase price over a ten-year period of monthly installments to Brian.  The documents further indicate David planned for Shoreline to purchase the remaining 245.5743 Shoreline shares from Brian, also making an upfront payment of $1,000,000.00, financing the remaining purchase price over a ten-year period of monthly installments to Brian.  On information and belief, David planned for _Shoreline_ to make the monthly payments for both David's shares and for Shoreline's shares.

28.    On information and belief, David then consulted with Shoreline's attorneys, Finn Dixon & Herling, LLP, to effectuate the purchase in accordance with this proposed structure, but he was apparently informed that David could not authorize Shoreline to purchase Brian's shares or to pay any of the purchase price for the shares David would receive from Brian.  An alternative Option to Purchase Agreement was drafted by Finn Dixon[5], on behalf of both Shoreline and

---

[5] Meanwhile, Mark was (and remains) responsible for a third of the Finn Dixon legal fees.

David, and executed in May 2023, pursuant to which David and/or Shoreline had the option to purchase Brian's shares in Shoreline for 90 days from the date of execution.

29.    Following the execution of the Option to Purchase Agreement, David insisted that Brian not tell Mark about the deal, but in the same breathe, David was adamant that Mark would be pleased with the buyout. David also warned that Brian would face serious legal and monetary consequences if Brian tried to back out of the deal.

30.    Based on the documents provided to Mark, David orchestrated the purchase of Brian's shares at significantly below fair value, claiming David was attempting to assist Brian with financial difficulties. However, at the same time, David was boasting about the bargain sale he got out of his unsuspecting brother, calling himself the "40 million dollar man."

31.    By June 6, 2023, David had secretly exercised his option to purchase all of Brian's shares at below fair value, without Mark's knowledge or any prior notice. This acquisition gave David majority control of Shoreline, with nearly 60% of the shares, while Mark retained only 29.7%, and the Credit Formula Trust held 11.15%.

32.    Mark first learned about the transaction on June 6, 2023, during a lunch meeting in New Canaan, where David disclosed his unilateral decision. Despite prior discussions in November 2021 about jointly buying out Brian's shares through Shoreline, David claimed that he had acted alone to avoid partnering with Mark's son, Dave.  David attempted to placate Mark by assuring him that nothing would change even with Mark as a minority shareholder and by promising to speak with lawyers about potentially securing more shares for Mark. He also agreed to provide written assurances for Mark's peace of mind—a promise he never fulfilled. Wrongly excluding Mark from the acquisition of Brian's shares marked the beginning of David's broader scheme to oppress Mark as a Shoreline shareholder.

**Removal of Mark from Management and Board of Directors**

33.    On June 26, 2023, Mark met with David for a second time to discuss the share acquisition. During this meeting, David informed Mark that he would not provide any additional shares to Mark. David shifted his reasoning, now citing concerns about Mark's wife, Kelli, potentially inheriting Mark's shares if Mark were to pass away. This marked a clear change in David's position and demonstrated his continuing efforts to consolidate control while marginalizing Mark.

34.    As a minority shareholder, Mark nevertheless had reasonable expectations of continued involvement in the management of Shoreline based on his long-standing role as Vice President of the Company and President of the service operations division, his lifelong contributions to the Company's success, and on his having access to the financial and business records of Shoreline.

35.    On June 30, 2023, after learning of David's purchase of Brian's shares, Mark sent a formal written request – as a Shoreline shareholder – for the production of corporate documents from Shoreline, including information on share ownership, tax returns and financial statements. A true and accurate copy of the letter is attached hereto as ***Exhibit A***.

36.    Despite Mark's standing as a minority shareholder with a statutory right to review corporate records under Conn. Gen. Stat. §§ 33-946 to 33-951, David, along with his personal legal counsel at Grayson & Associates, P.C., and Shoreline, along with its legal counsel, Finn Dixon, have unjustly refused to provide Mark with access to critical financial records following multiple written requests.

37.    As a result of Defendants' obstructing his rights as a shareholder, Mark was forced to file several proceedings for Bills of Discovery in the Superior Court, Judicial District of

Stamford/Norwalk, including a petition against David, to obtain documentary evidence regarding the ownership of Shoreline stock that had been transferred into the various trusts upon the death of Lucio.[6]  David and his counsel, Grayson & Associates, fought the Bills of Discovery for over a year until the issue was partially resolved as set forth herein.

38.    Between June and July 2023, as tensions increased, David and Mark exchanged text messages reflecting Mark's growing concerns that David was taking steps to force Mark out of the business.  David consistently responded that he would never hurt Mark, that nothing would ever change, and that he would always do right by Mark.

39.    On July 11, 2023, David called the first-ever Shoreline annual shareholder meeting for July 29, 2023, without proper notice or opportunity for Mark to participate. Mark was out of town and unavailable on the date of the proposed meeting.  On July 19, 2023, David alerted Mark that the meeting would now be a Special Shareholders Meeting.

40.    On July 21, 2023, Mark proposed, as an alternative, that Shoreline hold a meeting on July 26, 2023, to accommodate his availability.  He also requested a Special Shareholder Meeting be held on August 10, 2023, so he could participate. David rejected both proposals, dismissing the idea of a special shareholder meeting as pointless and refusing to reschedule.

41.    On July 26, 2023, Mark held a Board of Directors meeting, which David attended under strict conditions he imposed: prohibiting telephones, legal counsel, and the presence of

---

[6] *See* Docket No. FST-CV23-6063392-S. Plaintiff also filed petitions for Bills of Discovery against Shoreline's accountants, Masotti & Masotti, LLC (Docket No. FST-CV23-6063963-S) and against Richard Uva as trustee of the Credit Formula Trust and of Brian Lionetti's trust (Docket No. FST-CV23-6063960-S).  Because some of the requested documents regarding Shoreline stock ownership and certain tax information were finally turned over in a separate proceeding in the Stamford Probate Court, in connection with Plaintiff's Petition for Accounting filed in his father's Estate, all three Bill of Discovery proceedings were withdrawn on October 30, 2023, after more than a year of litigation.

Mark's wife, Kelli, or his son, Dave. During the meeting, David evaded Mark's inquiries about the company's financial and governance matters, refusing to disclose critical information. David further informed Mark that there would be no additional shares for him, claiming, "That ship has sailed." This interaction exemplified David's calculated efforts to marginalize Mark within the company's management and diminish his influence.

42.     Mark again voiced his growing concerns that David was working to take over Shoreline entirely, sidelining Mark as both a manager and a shareholder. After the meeting, David sought to placate Mark, assuring him in writing that he appreciated Mark raising his concerns, that he had "HEARD" them, and that he wanted to work with Mark toward a resolution. He requested a private meeting to discuss further, a promise that proved hollow.

43.     Despite Mark's repeated requests, David refused to reschedule the July 31, 2023, shareholder meeting to a date Mark could attend. Instead, the meeting proceeded without Mark's presence.

44.     On July 31, 2023, David convened a shareholder meeting, which he characterized as a "Special Shareholder Meeting," without Mark's approval or proper notice. In the days leading up to the meeting, David contacted Mark, claiming he had reconsidered Mark's concerns and suggesting a private discussion beforehand. This overture, however, was a deceptive tactic.

45.     During the meeting, which Mark could not attend, David, with the backing of a board comprised of individuals loyal to him, removed Mark as a member of the Board of Directors and stripped him of his roles as President of Shoreline Pools Service, Inc., and Vice President and Secretary of Shoreline Pools, Inc. These actions were a calculated effort to consolidate David's control over Shoreline and eliminate Mark's ability to challenge his authority.

46.    David, acting as majority shareholder, unilaterally removed Mark from Shoreline's Board of Directors without providing proper notice pursuant to Sec. 33-699(a). No resolution, proper advance notice, or compliance with record date requirements was given, resulting in Mark's removal being communicated improperly via email and without due process.

47.    David's willful and deliberate delay in scheduling the special meeting, combined with lack of proper notice under Conn. Gen. Stat. § 33-699(c),  prevented Mark from attending and participating in the meeting as a shareholder.

48.    Then, on September 30, 2023, based on David's unilateral determination, Shoreline putatively – and wrongly – terminated Mark's employment with the Company without any advance notice or warning, removing him entirely from the management of Shoreline and eviscerating his source of income. David's wrongful bully tactics towards Mark were in full go mode. David's termination of Mark finalized his strategy to eliminate Mark's influence and prevent him from continuing his decades-long contributions to Shoreline.

**Financial Obstructions and Denial of Records**

49.    Over the course of his employment with Shoreline, Mark[7] used the company's American Express account to pay for business expenses and arranged for its payment each month. After his termination from Shoreline, Mark attempted to make the account payment but was blocked by David and Shoreline, resulting in an outstanding balance of $18,580.90.  Despite Mark's formal demand for payment of the business expenses by Shoreline, the Defendants did not respond, forcing Mark to pay a total of $18,705.07 from his own funds to cover the balance

---

[7]  In addition to Shoreline, who used the card for new expenses as well as recurring monthly expenses.

in order to avoid severe consequences to his personal credit score. To date, Defendants have not reimbursed Mark.[8]

50.     Mark has also requested copies of his Form K-1s for Shoreline, but Shoreline and its professionals have only agreed to provide him with redacted versions of his own tax documents.

51.     Since Mark's termination from Shoreline, David has continued his oppressive tactics, including using company resources for David's own personal benefit and demanding unjustified payments from Mark as a form of negotiation and control.[9]  As set forth above, David, through his conduct and direction to Shoreline's accounting firm and Defendants' law firms, has wrongfully restricted Mark's access to critical corporate documents to which Mark is entitled as a shareholder.

52.     Mark was forced to file Bills of Discovery proceedings against David, Masotti & Masotti, LLC, and Richard Uva, after repeated requests by Mark for access to essential Shoreline corporate records, including documentation concerning tax records, financial statements, shareholder status, share transfers, and board resolutions that were unjustly withheld, obstructing

---

[8] Plaintiff ultimately was forced to file an action against Shoreline for unjust enrichment, which action remains pending in the Superior Court for the Judicial District of Stamford/Norwalk, Docket No. FST-CV23-6064504-S.

[9] On information and belief, Masotti & Masotti, the long-standing accounting firm for Shoreline, also participated in this oppressive scheme by withholding crucial financial records from Plaintiff, despite his statutory right under Conn. Gen. Stat. §§ 33-946 to 33-951 to inspect such documents.  On information and belief, the above-referenced acts of misconduct, including the refusal to produce financial records (including unredacted versions of tax forms) and participation in oppressive schemes, were conducted with the assistance, knowledge, and/or involvement of Grayson & Associates PC, Finn Dixon, and Masotti & Masotti, LLC, who acted as legal counsel and accountants for Shoreline Pools, Inc. and David Lionetti.

Mark's rights as a minority shareholder and his ability to fully understand and protect his interests in Shoreline.

53.    On information and belief, in 2023, Shoreline's board of directors, of which David is chair, decided to unilaterally and without Mark's consent apply a portion of shareholder distributions owed to Mark for 2022 – approximately $190,000.00 – to an alleged Shoreline expense for the construction of a pool at Mark's residence.  This decision was made despite the fact that other Shoreline officers and directors, including David, have received pools, fences and other related work at no personal expense, as a perquisite of their roles as owners and officers of Shoreline. David's actions were inequitable and part of his broader scheme to marginalize Mark as a shareholder and to damage him financially in an effort to wrest control of Shoreline from Mark.

54.    Upon information and belief, David has diverted Shoreline resources for personal benefit, including using company personnel for home improvement projects and paying excessive salaries to his immediate family members, many of whom do not actively contribute to the business.

## CLAIMS FOR RELIEF

### COUNT ONE
### Minority Shareholder Oppression (Conn. Gen. Stat. § 33-896)
### (as to David Lionetti and Shoreline Pools)

55.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 54 as though fully set forth herein.

56.    David's conduct, including but not limited to his consolidation of power, clandestine purchase of Brian's shares to become majority shareholder in Shoreline, and

exclusion of Mark from corporate governance, constitutes oppressive conduct that has substantially prejudiced Mark as a minority shareholder.

57.     Mark, as a minority shareholder of Shoreline, was entitled to fair treatment and participation in the management and decision-making processes of the corporation.

58.     David's conduct constitutes a clear pattern of oppressive behavior designed to strip Mark of his rights as a minority shareholder.

59.     As President, Chairman of the Board, and majority shareholder, David owed Shoreline shareholders the duty to act in good faith and in the best interests of Shoreline and its shareholders.

60.     David, as the majority shareholder and officer of Shoreline, owes Mark, a minority shareholder, a fiduciary duty to act in a manner that is fair, just, and equitable.  In closely held corporations, the majority shareholders or those in control must uphold fiduciary responsibilities to protect the interests of minority shareholders and maintain trust within the corporate structure.

61.     David's conduct demonstrates a clear departure from the duties of loyalty and care owed to the corporation and its minority shareholders.

62.     David's aforementioned actions constitute a breach of fiduciary duties to the detriment of Mark.

63.     David has engaged in a series of actions that departed from the requisite fair dealing and equitable treatment, and constituted oppressive misconduct by:

    a.     Removing Mark from the Board of Directors without proper cause, notice or due process;

b.    Withholding corporate records, thus preventing Mark from exercising his rights as a shareholder to have access to those records;

c.    Failing to hold shareholder meetings in compliance with statutory notice requirements, thus preventing Mark from exercising his rights as a shareholder to participate in corporate governance of Shoreline;

d.    Using corporate resources and engaging in transactions for personal gain to the detriment of Mark and at the expense of the company's integrity;

e.    Secretly orchestrating and executing the acquisition of Brian's shares at terms advantageous only to David, further consolidating his power without notice or transparency;

f.    Refusing to make payments on the Shoreline American Express business credit card, with the full knowledge that failure to do so would have a detrimental effect on Mark's personal credit score, despite Shoreline being unjustly enriched and responsible for the charges;

g.    Unilaterally applying a portion of Mark's shareholder distributions to Shoreline expenses without Mark's knowledge or approval, potentially exposing Mark to significant personal and financial harm; and

h.    David's actions, including fabricating tax documents, withholding corporate records, and leveraging financial pressure against Mark, demonstrate a deliberate strategy to oppress Mark and deny him the full benefits of his shareholder rights.

64.    Defendant's actions constitute an egregious abuse of power and further demonstrate a pattern of manipulating corporate affairs for personal gain through oppressive conduct.

65.     Such conduct has substantially interfered with Mark's reasonable expectations as a shareholder and co-manager of Shoreline in the following ways:

    a.     Excluding him from participating in the decision-making processes and management of Shoreline;

    b.     Depriving him of access to corporate records necessary to protect his interests and understand the company's financial position;

    c.     Diminishing Mark's financial interests in the company through manipulative transactions and exclusionary conduct;

    d.     Undermining Mark's reasonable expectations as a shareholder and co-manager, resulting in financial loss, reputational damage, and the deprivation of the full benefits associated with his ownership stake.

## COUNT TWO
### Breach of Fiduciary Duty – Direct
### (as to David Lionetti)

66.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 65  as though fully set forth herein.

67.     Under Connecticut law, as a majority shareholder of Shoreline, David owed a fiduciary duty to Mark as a fellow and minority shareholder.

68.     David's unilateral decisions and misrepresentation of key financial and corporate governance matters have breached the duties of loyalty and care, as demonstrated by exclusionary practices and preferential treatment toward himself.

69.     David's failure to disclose material financial information and his actions that favored his personal interests over those of the Company and its shareholders, including Mark, are breaches of fiduciary duty to Mark.

70.    Specifically, David breached these fiduciary duties by engaging in the following conduct:

a.    Self-dealing and misappropriation of company assets;

b.    Facilitating the sale of corporate stock in Shoreline below fair value for personal gain;

c.    Mismanaging the financial affairs of Shoreline and refusing to disclose material information to Mark; and

d.    Upon information and belief, misappropriating funds from Shoreline's cash accounts for personal expenses.

71.    David, by excluding Mark from corporate decision-making and failing to act in the best interests of the shareholders of the corporation, has breached his fiduciary duty to Mark as a minority shareholder.

72.    Defendant's breach has resulted in harm to Mark's interests as a shareholder.

73.    As a direct result of David's breaches of his fiduciary duties, Mark has suffered damages.

74.    David has also used his power over Shoreline to manipulate and financially pressure their brother Brian, upon information and belief, threatening to cut off Brian's only source of income if he assists Mark with this lawsuit. This pattern of exploiting family members for personal gain underscores David's broader breach of fiduciary duty.

## COUNT THREE
### Breach of Statutory Duty of Conduct for Officers
### (Conn. Gen. Stat. § 33-765)
### (as to David Lionetti)

75.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 74 as though fully set forth herein.

76.    At all relevant times, David served as an officer of Shoreline, holding positions of authority, including President and Chairman of the Board.

77.    Under Conn. Gen. Stat. § 33-765, David, as an officer with discretionary authority, was obligated to discharge his duties:

    a.    In good faith;

    b.    With the care an ordinarily prudent person in a like position would exercise under similar circumstances;

    c.    In a manner he reasonably believed to be in the best interests of Shoreline.

78.    David breached his statutory duties under Conn. Gen. Stat. § 33-765 through the following actions:

    a.    Engaging in conduct that prioritized his personal interests over the interests of Shoreline and its shareholders, including Mark;

    b.    Secretly acquiring the shares of his brother, Brian, without Mark's knowledge or consent, thereby consolidating his control over the corporation and marginalizing Mark's role;

    c.    Orchestrating the removal of Mark from the Board of Directors and from his position as Vice President without due process, proper notice, or justification, actions that were not in the best interests of the corporation;

d.      Withholding corporate records and financial information, including providing

Mark with only a redacted version of his own Form K-1s, impeding Mark's ability

to oversee and participate in the governance and decision-making processes of

Shoreline; and

e.      Using corporate resources for personal gain, including exerting pressure on Mark

through demands for payment related to a construction project agreed upon as a

benefit of Mark's position.

79.     David failed to act in good faith and did not exercise the level of care an ordinarily

prudent person in a similar position would have exercised. His actions constituted a departure

from the standards expected of an officer under Conn. Gen. Stat. § 33-765 and has thus breached

the appropriate standard of care.

80.     As a direct result of David's breaches of his statutory fiduciary duties, Mark has

suffered damages.

## COUNT FOUR
**Compelled Disclosure of Records (Conn. Gen. Stat. §§ 33-946 to 33-951)**
**(as to David Lionetti and Shoreline)**

81.     Plaintiff repeats and realleges the allegations in Paragraph 1 through 80 as though

fully set forth herein.

82.     Under Connecticut law, Mark, as a shareholder, is entitled to inspect corporate

records, including financial statements and tax filings.

83.     As set forth above, despite Mark's written request for access to Shoreline's

corporate and financial records, his access has been refused.

84.     The refusal by David, through Finn Dixon and Masotti & Masotti, to provide

access constitutes a violation of Mark's statutory rights.

85.    Mark accordingly seeks an order compelling Shoreline and David to forthwith provide Mark with access to the corporate and financial records he is entitled to have under Connecticut law.

## COUNT FIVE
### Request for Accounting (Conn. Gen. Stat. § 52-401 *et seq.*)
### (as to Shoreline)

86.    Plaintiff repeats and realleges the allegations in Paragraph 1 through 85 as though fully set forth herein.

87.    Mark is entitled to a full accounting with regard to all of Shoreline's revenues, assets and sale proceeds, as well as Shoreline's payment of taxes.  Such an accounting is necessary to allow Mark to value and recover his interest in any such revenues not properly paid to him as a shareholder.

88.    Based on the foregoing, Mark requests an accounting of Shoreline pursuant to Conn. Gen. Stat. §§ 52-401 and 52-402, for the period of January 1, 2014 through the present.

89.    Accordingly, Mark requests the court appoint a neutral third party or allow reasonable access by Mark to either (a) audit Shoreline's books and financial records or (b) engage in a valuation of Shoreline to calculate a fair determination of the value of Mark's interest.

## COUNT SIX
### Judicial Dissolution (Conn. Gen. Stat. § 33-896(a)(1)(B))
### (as to David Lionetti, Shoreline and Richard Uva (Trustee))

90.    Plaintiff repeats and realleges the allegations in Paragraph 1 through 89 as though fully set forth herein.

91.    As set forth herein, Shoreline, by and though David, has acted in a manner that is illegal, oppressive, and/or fraudulent by, including, but not limited to:

a.    Removing Mark from the Shoreline Board of Directors and terminating his position as Vice-President;

b.    Disregarding corporate formalities and fiduciary responsibilities owed to Shoreline shareholders, including Mark as a minority shareholder;

c.    Conducting a secret buyout of shares without proper notice or transparency;

d.    Holding shareholder meetings without proper notice and excluding Mark from participation;

e.    Engaging in self-dealing and manipulation to consolidate control;

f.    Demonstrating a complete disregard for fiduciary duties to the detriment of Mark as a minority shareholder in Shoreline.

92.    The continuous pattern of exclusion, self-dealing, and manipulation by David has substantially defeated Mark's reasonable expectations and rights as a shareholder that were central to his participation in the management and ownership of Shoreline.

93.    David's conduct, including his manipulation of corporate finances, exploitation of family members, and persistent breach of fiduciary duties, has rendered it impracticable to continue Shoreline's operations under his control.

94.    By engaging in the conduct described above, David has engaged in conduct that is oppressive and directly harmful to Mark.

95.    As a direct and proximate result of the oppressive, illegal, and/or fraudulent conduct of David, Mark has been and will continue to be harmed, making judicial intervention necessary to protect Mark's interests.

96.    Based on the foregoing, it is not reasonably practicable to carry on the activities and affairs of Shoreline.

97.    Accordingly, pursuant to Conn. Gen. Stat. § 33-896(a)(1), Shoreline Pools, Inc. should be dissolved or, alternatively, the Defendants, or any one of them, including David and/or Richard Uva in his capacity as Trustee of the Credit Formula Trust, should be compelled to purchase Mark's shares at fair value.

98.    Based on the egregiousness of David's misconduct, pursuant to Conn. Gen. Stat. §33-898(a), Mark also requests that the Court appoint a receiver either to wind up Shoreline's affairs or, until the remaining shareholders determine whether to purchase Mark's shares at fair value, to manage the day-to-day operations of Shoreline pending such buyout.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, Mark Lionetti, requests that this Court enter judgment in his favor and against Defendants, awarding the following relief:

1. An order requiring Defendants to provide full access to corporate financial records as stipulated under Conn. Gen. Stat. §§ 33-946 to 33-951;

2. An accounting of all company transactions conducted by Defendant David Lionetti and any affiliated parties during the period relevant to this Complaint;

3. A declaration from the court affirming Plaintiff's rightful status as a shareholder with full rights;

4. Damages for breach of fiduciary duty;

5. Judicial dissolution of Shoreline Pools, Inc., pursuant to Conn. Gen. Stat. § 33-896, and the appointment of a Receiver, pursuant to Conn. Gen. Stat. § 33-898, as set forth in Count Six, or alternatively, an order compelling the Defendants, or any one of them, to buy Plaintiff's Shoreline shares at fair value;

6. An award of reasonable attorney's fees and costs;

7. Pre- and post-judgment interest to the maximum extent permitted by law (All Counts);

8. Award of compensatory and punitive damages for willful, malicious, and oppressive

   conduct; and

9. Any other relief the Court deems just and proper.

### **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues so triable.

PLAINTIFF, MARK LIONETTI

By ____/s/ *Lorey Rives Leddy*_____
     Robert E. Kaelin – ct#11631
     rkaelin@murthalaw.com
     Lorey Rives Leddy – ct#19297
     lleddy@murthalaw.com

Murtha Cullina LLP
280 Trumbull Street
Hartford, Connecticut 06103
Telephone:  860.240.6000
Facsimile:   860.240.6150
His Attorneys